```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                     WESTERN DIVISION

 3  UNITED STATES OF AMERICA,        )  Docket No. 15 CR 50026
                                     )
 4                  Plaintiff,       )  Rockford, Illinois
                                     )  Thursday, December 17,
 5     v.                            )  2020
                                     )  2:15 o'clock p.m.
 6  ADRIAN PETERS,                   )
                                     )
 7                  Defendant.       )

 8                    TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE MATTHEW F. KENNELLY
 9
     APPEARANCES:
10
     For the Government:        HON. JOHN R. LAUSCH, JR.
11                             (327 S. Church Street,
                                Rockford, IL  61101) by
12                              MICHAEL D. LOVE
                                Assistant U.S. Attorney
13
     For the Defendant:         FEDERAL DEFENDER PROGRAM
14                             (401 W. State Street,
                                Suite 800,
15                              Rockford, IL  61101) by
                                MS. JILL M. SKWOR
16
     Also Present:              MS. TORI POWELL
17                              Probation Office

18   Court Reporter:           Heather M. Perkins-Reiva
                                327 South Church Street
19                              Rockford, Illinois  61101
                                (779)772-8309
20

21

22

23

24

25
```

```
 1              THE CLERK:  15 CR 50026, USA v. Adrian Peters.

 2              THE COURT:  Hang on one second.

 3     (Brief pause.)

 4              THE COURT:  Okay.  Go ahead.

 5              MR. LOVE:  Good afternoon, your Honor.  Mike Love for

 6     the United States.

 7              MS. SKWOR:  Good afternoon, your Honor.  Jill Skwor

 8     with the Federal Defender Program, here on behalf of

 9     Mr. Peters.  Mr. Peters is present to my left.

10              MS. POWELL:  Good afternoon, Judge.  Tori Powell with

11     U.S. Probation.

12              THE COURT:  So as far as I'm concerned, if you are

13     not talking, you can sit down.

14              MR. LOVE:  Thank you, your Honor.

15              THE COURT:  I mean, I assume -- can we turn on the

16     mics on the tables?

17              THE CLERK:  They are on.

18              THE COURT:  They are on?

19              THE CLERK:  Yes.

20              THE COURT:  Good.  All right.  I mean, it is easier

21     for me, if you are talking, if you come up to the podium, but

22     everybody doesn't have to be on their feet the whole time.

23              And I should get that mic in front of me, too, so you

24     can actually hear me.

25              Okay.  So a few things, sort of preliminaries here.
```

1    So does the government have any objections or

2  corrections to anything in the presentence report.

3    MR. LOVE:  No, your Honor.

4    THE COURT:  And, Ms. Skwor, have you read the

5  presentence report and discussed it with Mr. Peters?

6    MS. SKWOR:  Yes, your Honor, I have.

7    THE COURT:  Mr. Peters, have you read the presentence

8  report?

9    You have to say it out loud.

10    DEFENDANT PETERS:  Yes.

11    THE COURT:  And have you discussed it with your

12  lawyer?

13    DEFENDANT PETERS:  Yes, your Honor.

14    THE COURT:  Okay.  So putting aside the guidelines

15  issues for now, are there any objections or corrections to

16  anything?

17    MS. SKWOR:  Your Honor, there were a couple.

18    And before I get started, your Honor, could I just

19  note for the court I have -- Marcos Barbery from my office is

20  present.

21    THE COURT:  I assumed that's who that was because you

22  said he was going to be here.

23    MS. SKWOR:  Yes.

24    And, your Honor, my client was expecting his mother

25  to be here.  I think through some misunderstanding about the

```
 1  time, we don't have her here today.  I have asked Mr. Barbery
 2  to get in touch with her, and if it's possible, maybe we will
 3  talk to the clerk about her appearing by telephone.
 4          THE COURT:  Sure.  I mean, I'm okay with that.
 5          I mean, if you need to step out to do that, that's
 6  just fine, Mr. Barbery.
 7          MR. BARBERY:  Excuse me, your Honor.
 8          She has just written, and she was confused about the
 9  time.  She misunderstood.  But she could be available for a
10  call.
11          THE COURT:  Okay.  We will figure that -- I'm not
12  sure if it works the same way in here as it works in Chicago,
13  but --
14          THE CLERK:  We will figure it out.
15          THE COURT:  We will figure it out, yes.  We will get
16  that at the appropriate point in time.
17          MR. BARBERY:  Thank you, your Honor.
18          THE COURT:  All right.  So --
19          MS. SKWOR:  Factual objections to PSR.
20          THE COURT:  Right.
21          MS. SKWOR:  Your Honor, I did put in the defense's
22  sentencing memorandum that on page 2, Mr. Peters disagreed
23  with the characterization of the incidents described in
24  paragraphs 44 through 46 of the presentence report and that he
25  disagreed -- I'm sorry -- he denied the allegations in
```

1    paragraph 47.

2            Now, those paragraphs describe the police reports

3    by --

4            THE COURT:  So this was -- so, wait, this is in the

5    section that's headlined "Other Conduct"?

6            MS. SKWOR:  Yes, your Honor.

7            THE COURT:  All right.  So it's not part of the

8    offenses of conviction.  It's not part of the stipulated

9    conduct.  It's part of everything else.  And I had made a note

10   on the presentence report that there was a dispute about the

11   allegations in that section.

12           MS. SKWOR:  Thank you, your Honor.

13           THE COURT:  Okay.

14           MS. SKWOR:  And then --

15           THE COURT:  So I guess -- and maybe you will tell me

16   your view of this on the government's side, Mr. Love, but, I

17   mean, if there is a dispute about the facts about that, I

18   can't take it into account unless I make findings.  I mean,

19   honestly, there is enough in the presentence report that I'm

20   not sure that I need to deal -- to take account of that other

21   conduct.

22           So what's your view on that?

23           MR. LOVE:  I understand, your Honor.

24           As far as the government is concerned, the

25   defendant's denial of paragraph 47 and a disagreement with 44

1   through 46, without more, allows the court to take it into

2   consideration for the purpose of sentencing if the court deems

3   it reliable.

4           THE COURT:  Yes.

5           MR. LOVE:  And you already mentioned that it's police

6   reports.  If the court doesn't find those reliable without

7   hearing from the officers, the government understands and

8   accepts the court's ruling.

9           THE COURT:  That is kind of my view of it.  And I

10  know that I'm kind of an interloper out here, and I'm not sure

11  how these kinds of issues have been dealt with by others, but

12  that is kind of my view of it, particularly -- I mean, if it

13  was something that was relatively inconsequential, I guess I

14  could see that, but this isn't.

15          I mean, the terms of what's alleged there, it's

16  pretty serious activity, and, to me -- and we could argue

17  about whether this is the right way of looking at it or not --

18  to me, the more serious it is, the more concern I have about

19  being real clear on reliability, and, to me, just essentially

20  repeating what's in a police report, without having some

21  witness that can be questioned, is I think problematic.  So

22  I'm not comfortable relying on it without more.

23          MR. LOVE:  Understood, your Honor.

24          THE COURT:  All right.  So there you go.

25          But anything else in terms of factual objections?

1          MS. SKWOR:  Your Honor, with respect to paragraphs 44

2    through 47, that satisfies the defense.

3          With respect to Paragraph 134 of the presentence

4    report, there is a statement that --

5          THE COURT:  134.  Okay.  I'm there.

6          MS. SKWOR:  The statement that Mr. Peters was

7    interviewed by an unknown police department, Mr. Peters would

8    like to clarify it was the Roscoe Police Department that

9    interviewed him.

10          THE COURT:  What?

11          MS. SKWOR:  Roscoe, R-o-s-c-o-e.

12          I'm sorry, Judge.

13          THE COURT:  Okay.  No, that's okay.  I wasn't sure if

14    you said Rockford, Rockville, or Roscoe, and with the facemask

15    on, they all kind of sound the same.

16          MS. SKWOR:  That is all I have as far as factual

17    objections.

18          THE COURT:  Okay.  So, I mean, that particular issue

19    isn't a matter of consequence, so I don't think the PSR needs

20    to be corrected or anything.

21          So in terms of the guideline calculation, let me tell

22    you what my takeaway is from what was submitted.

23          So the dispute has to do with the

24    obstruction-of-justice enhancement and the

25    acceptance-of-responsibility adjustment, which are

1    interrelated, at least in terms of the recommendation by the

2    probation officer, and I guess everybody is sort of assuming

3    that there is going to be or that there may at least be some

4    other charge that gets filed involving the -- Mr. Peters not

5    being in court and going to Canada.  So that much I get.

6         I mean, I get from the defense memorandum -- and let

7    me just turn to it here so I don't misstate it -- that you

8    don't think that there is enough there for a finding of

9    specific intent, and I just want to focus on the obstruction

10   enhancement for a second.

11        So is that the gist of the objection to it?

12        MS. SKWOR:  Yes, your Honor.

13        THE COURT:  And the specific intent in this case

14   would be -- I mean, you quote the *Martinez* case on Page 3 of

15   your memorandum, "Defendant knew he had to appear in court and

16   voluntarily and intentionally failed to do so," right?

17        MS. SKWOR:  That's correct, your Honor.

18        THE COURT:  Okay.  So I suppose I could pull up the

19   docket here, but my laptop ran out of juice.  I didn't bring

20   it down to the courtroom with me.

21        But I would assume that there is some official record

22   that on whatever the previous date was that Mr. Peters was

23   told that the next court date was June the 30th of 2016?

24        Is that a fair assumption or am I wrong?

25        MR. LOVE:  It is a correct assumption, your Honor.

1          THE COURT:  Hang on one second.

2          Do you disagree?

3          MS. SKWOR:  I don't disagree.

4          THE COURT:  Okay.  And presumably what he was told is

5    "It's June the 30th, 2016" or whatever, right?

6          MS. SKWOR:  Yes, your Honor.

7          MR. LOVE:  Your Honor, the transcript is at Docket

8    Entry No. 32 in the court's record.

9          THE COURT:  Okay.  So on the "knew he had to appear

10   in court," is there something more that would have to exist

11   than that, that the defendant was in the courtroom and was

12   told "The next court date is June the 30th of 2016" on that

13   part of the finding?

14         So it is "knew he had to appear and voluntarily and

15   intentionally failed to do so."  I'm just focusing on "knew he

16   had to appear."  Is there something more that would be

17   required to show that?

18         MS. SKWOR:  No, your Honor.

19         THE COURT:  Okay.  So what we are really focusing on

20   is the "voluntarily and intentionally failed to do so."

21         MS. SKWOR:  Correct.

22         THE COURT:  Okay.  So we know, because it's also a

23   matter of public record, that on that exact day, June the

24   30th, Mr. Peters was in Ottawa, Canada, because he was

25   arrested?

1            MS. SKWOR:  Correct.

2            THE COURT:  Maybe I'm just dense, but isn't the fact

3    that Mr. Peters is several hundred miles away on the day that

4    he is supposed to be here enough evidence to make a reasonable

5    inference that he voluntarily and intentionally didn't show up

6    in court on that day?  I mean, is there some reason to belabor

7    that he could have taken like a bullet train from there to

8    here and been to court on time?

9            MS. SKWOR:  Your Honor, for that, I believe the onus

10   is on the government to prove --

11           THE COURT:  But I can infer it from circumstantial

12   evidence like anything else.  He is several hundred miles away

13   when he is supposed to be here.  I mean, how can -- is there

14   some reason why I cannot infer from that that he voluntarily

15   and intentionally didn't appear here because he was in a

16   different country several hundred miles away?

17           MS. SKWOR:  No, your Honor.  We concede that you can

18   deduct from the circumstantial evidence.

19           THE COURT:  Yes.  I mean, am I missing anything on

20   the law on that?

21           MR. LOVE:  No, your Honor.

22           I would note, though, in addition to the inference

23   that the court makes, the defendant did not deny the conduct

24   that's described in paragraphs 49 to 53 of the presentence

25   investigation report which have to do with that incident and

 1   going to Canada.

 2            Further, in terms of the court's ability to infer

 3   specific intent from the defendant's conduct and therefore his

 4   inability, I would point the court to *U.S. v. Schwanke*,

 5   S-c-h-w-a-n-k-e, 694 F.3d 894, Seventh Circuit, 2012.

 6            THE COURT:  What's it say?

 7            MR. LOVE:  It says that specific intent is usually

 8   inferred from the defendant's conduct.

 9            THE COURT:  Right.

10            MR. LOVE:  I note in this case, it is neither

11   unrebutted nor denied.

12            THE COURT:  Right.

13            And I have to say I'm not sure I even have to rely on

14   the failure to deny it.  I mean, specific intent and intent

15   generally -- intent as a general rule is what I meant to say

16   by that -- you know, it's the rare case where you have got

17   direct evidence of it where somebody says, "Yes, I decided not

18   to do this" or "I decided to do this."  I mean, you certainly

19   have cases like that in which somebody has made a post-arrest

20   admission or something like that.

21            But in your average case, it is inferred from other

22   evidence, and I am completely satisfied that the requisite

23   specific intent is shown from the circumstantial evidence in

24   the case, the fact that Mr. Peters was in court when he was

25   told he had to be in court on June the 30th of 2016.  He

 1    wasn't in court on June the 30th of 2016, and, in fact, he was

 2    several hundred miles away in Ottawa, Canada, where he was

 3    arrested by the authorities there.  If that's not enough to

 4    show voluntary and intentional failure to appear in the

 5    Rockford courthouse on that date, it would be hard to imagine

 6    what would be.  So I think the showing has been made for the

 7    obstruction enhancement.

 8            I do agree that the acceptance is arguably a separate

 9    matter.  I mean, there is -- as you all know, there is the

10    language in the guidelines and the commentary that talks about

11    ordinarily when you get tagged with obstruction, you don't get

12    credit for acceptance, but there is -- at this point, it is a

13    pretty old case.  I think it is from like 1999 or 2000.  It is

14    called Lallemand -- *U.S. v. Lallemand*, L-a-l-l-e-m-a-n-d.  It

15    is an opinion by Judge Posner which will make the next part

16    not surprising:  He makes it a mathematical formula where the

17    defendant cannot accept responsibility at time T, but accept

18    responsibility at a later time, T1.  So it is at least an open

19    question, I think, whether Mr. Peters can get credit for

20    acceptance based on what happened after the episode where he

21    went to Canada.

22            So why don't you -- I mean, I have obviously read

23    what you said, but would you like to supplement what you said

24    at all?

25            MS. SKWOR:  No, your Honor.  I will rely on my brief.

```
 1            THE COURT:  Okay.  And what about the government?
 2            I mean, I guess you didn't have a chance to respond
 3   to that part of the memo, so, Mr. Love, go ahead.
 4            MR. LOVE:  Regarding, your Honor?
 5            THE COURT:  Acceptance.
 6            MR. LOVE:  Acceptance?
 7            THE COURT:  Yes.
 8            MR. LOVE:  Your Honor, the government looked at that
 9   very carefully in terms of the plea agreement that was entered
10   into with the defendant.
11            If I could just have a moment?
12            THE COURT:  Yep.
13            MR. LOVE:  I apologize, Judge.  I need to get to the
14   right paragraph.
15     (Brief pause.)
16            MR. LOVE:  At paragraph 115 of the presentence
17   report, the probation officer noted exactly what the court has
18   just said and then found that the -- the probation officer
19   found that there are no extraordinary circumstances in which
20   an enhancement for obstruction and a reduction for acceptance
21   of responsibility would apply; therefore, the probation office
22   has not.  As outlined in the plea agreement, the parties did
23   agree, and we gave that considerable thought at the time,
24   Judge, and it was a very difficult decision because whether we
25   are right or wrong about this, one of the factors that we took
```

1   into account is the expectation that there will be a future

2   criminal case.

3           THE COURT:  Uh-huh.

4           MR. LOVE:  And trying, to the best of our ability, to

5   have the defendant sentenced on what he has done in this case,

6   taking into account that there should be another sentencing in

7   the future, we did the best decision that we could -- we made

8   the best decision we could with those facts.  We may very well

9   be wrong.  I certainly understand that from a procedural

10  standpoint if the court finds that there is no acceptance, it

11  must not credit the defendant with those points for procedural

12  purposes in the sentencing.

13          THE COURT:  I mean, in terms of the overall

14  calculation, it actually does not make a difference, right?

15  Because the number, after you do all the multiple-count stuff,

16  comes out to so far above 43 that it gets reduced to 43.  So

17  even if you took another three levels off, it would still be

18  significantly above 43, right?

19          MR. LOVE:  Correct, your Honor.

20          THE COURT:  Yeah.

21          That's right, right?

22          MS. SKWOR:  I acknowledge that on page 5 of my

23  sentencing memo.

24          THE COURT:  Okay.  So let me ask a question about the

25  stipulated offenses, and I should know the answer to this, but

1    I don't, so I will ask Mr. Love this:  So the stipulated

2    conduct, you know, items 1, 2, 3, I guess, and 4, whatever the

3    number, were those all counts in the original -- in the

4    indictment?

5            MR. LOVE:  I believe they were, your Honor.

6            THE COURT:  Okay.  All right.  Okay.  All right.  I'm

7    actually going to come back to that after we have talked about

8    everything else that we are going to talk about because I

9    think some of the other things may have a bearing on it.

10           So at what point do you want me to try to hook -- do

11   you want us to try to hook Mr. Peters' mother in?

12           Do you got a number for her?

13           MS. SKWOR:  We do, your Honor.

14           Your Honor, it's my understanding she is actually on

15   her way to the courthouse, and she should be here in about 20

16   minutes or so.  I think we can proceed.  I had intended to

17   have her present for the discussion of 3553(a) factors.

18           THE COURT:  That's kind of where we are.

19           MS. SKWOR:  Okay.  In that case, we can get her on

20   the phone.

21           THE COURT:  Well, let me ask you this:  I think your

22   memorandum said we are going to have your mitigation person

23   talk.

24           MS. SKWOR:  Yes.

25           THE COURT:  Maybe we could do that.  Can we do that

1  now?  And that will buy us a little bit of time.  If he is

2  going to talk at some point, that will provide us a little bit

3  of time for the mom to come.

4          MS. SKWOR:  It does.  And I believe he is prepared to

5  address the court at this time.

6          THE COURT:  Okay.  How are you proposing to do this;

7  just come up to the podium?

8          MS. SKWOR:  If that's okay.  I was not planning on

9  having him take the stand.

10          THE COURT:  Okay.  All right.  If Mr. Love wants to

11  ask questions, I will let him do that.

12          So why don't the two of you sit down, and he can come

13  up.

14          And, Mr. Love, if you want to stand up, that's fine,

15  but don't feel like you have to.

16          MR. LOVE:  Thank you, your Honor.

17          I would, if I may, your Honor, before the defendant's

18  mother gets here, there is something I should address with the

19  court.

20          THE COURT:  Okay.  Go ahead.  Why don't you do that

21  now.

22          MR. LOVE:  The defendant's mother is a target in the

23  investigation regarding his --

24          THE COURT:  Right.

25          MR. LOVE:  I didn't know if the court was aware.

1          THE COURT:  I assumed it.

2          MR. LOVE:  She is a target in that investigation.  So

3    the government would request that she be placed under oath for

4    her statements here today.  I understand that's in your

5    discretion, your Honor.

6          THE COURT:  Yes.

7          MR. LOVE:  But I at least think that the court may

8    want to consider giving her a warning.

9          THE COURT:  Okay.  Were you planning -- Ms. Skwor,

10   were you planning to ask her to talk or was she just going to

11   come to listen?

12         MS. SKWOR:  It is my understanding that she just

13   wanted to be present.

14         THE COURT:  Okay.  That's fine.

15         So if it turns out she wants to talk, we will cross

16   that bridge when we get to it.

17         MR. LOVE:  Understood.

18         THE COURT:  Okay.  So your name?

19         MR. BARBERY:  My name is Marcos Barbery.

20         THE COURT:  Thanks.

21         And spell the last name.  I mean, they probably know

22   it, but just for the record.

23         MR. BARBERY:  B, as in boy, a-r-b, as in boy, e-r-y.

24         THE COURT:  All right.  What would you like to tell

25   me?

1          MR. BARBERY:  Good afternoon, your Honor.

2          From the very beginning, when Adrian was a toddler,

3  there were signs, glaring signs, that something was wrong, and

4  though she wasn't a nurse at this point, Adrian's mother knew

5  instinctively that Adrian's development was stunted, that

6  Adrian wasn't reaching the same milestones as other kids his

7  same age, that his behavior was odd, impulsive, disruptive

8  more so than others, and despite being in the throes of an

9  acrimonious divorce and a custody battle with Adrian's father,

10  Adrian's mother attempted to identify what was wrong with her

11  son, and doctors gave Adrian's mom superficial answers to what

12  were far more complex to what was -- to what was a far more

13  complex and devastating problem.

14          She was told Adrian's delayed speech was a

15  consequence of his ear infections and that this alone

16  explained why Adrian made sounds that were indiscernible to

17  others long after children his age were speaking words and

18  stringing them together into sentences.

19          And by the time Adrian entered preschool, he finally

20  learned to speak, but you could not so much as hand Adrian a

21  pencil because he was so profoundly impulsive that he would

22  immediately stab himself or whoever was next to him.

23          Even then, Adrian seemed to lack basic self- and body

24  awareness.  He ran into other children.  He could not sit

25  still or remain on task for very long.  Adrian's teachers in

1    kindergarten demanded action, so Adrian's mother took Adrian

2    to the local family physician, and the doctor observed Adrian

3    for a few moments and diagnosed Adrian with the most basic

4    catch-all diagnosis:  ADHD.

5         And perhaps the medication the family doctor

6    prescribed for Adrian would have been somewhat effective had

7    it been administered as prescribed, but at that point,

8    Adrian's parents didn't even so much as speak to one another,

9    let alone maintain continuity in ensuring that Adrian took his

10   medication appropriately.

11        In grade school, Adrian learned -- Adrian began to

12   stutter.  It didn't make him very popular.  Adrian also

13   started to develop effeminate qualities and an extreme kind of

14   rigidness and need for repetitiveness.  For an entire year,

15   Adrian refused to eat anything except peanut butter

16   sandwiches.

17        At his mother's, Adrian has to endure a new

18   stepfather named Eric, and Eric, frankly, identified what

19   Adrian's problem was:  Adrian was spoiled, his mother babied

20   him too much, and Adrian let himself get pushed around.  So

21   Eric believed the best way to address Adrian's problem was to

22   physically overpower him, to beat Adrian into submission, and

23   to emotionally abuse him.

24        At the same time, over at Adrian's father's on

25   weekends and holidays and summers, Adrian was violated.  He

1 endured pain and confusion that would cast long shadows over

2 his life. The reason was because Adrian's father looked at

3 his son and he saw this physically awkward boy, without

4 friends, who appeared weak and girly, and he feared that there

5 was something profoundly wrong him. Adrian's father, who by

6 all accounts was homophobic, was terrified that his son was

7 gay.

8 And so Adrian's father came up with this novel plan:

9 He was going to teach his young son what was appropriate

10 male-on-female sexual behavior. Adrian's father forced his

11 grown adult girlfriends to engage in sexual acts with Adrian,

12 who was just a child. Eight, nine years old, Adrian found

13 himself being touched by his dad's girlfriends and his father

14 cheering him on. Adrian was just a boy when he was forced to

15 have his first kiss with a grown woman, his own father's

16 girlfriend, and Adrian had to taste the cigarette smoke on her

17 tongue.

18 Meanwhile, in school, Adrian was having trouble

19 connecting with kids his own age. Adrian said the wrong

20 things at the wrong time. He had trouble maintaining eye

21 contact. Adrian found himself serving as the punch line to

22 other people's jokes.

23 Kids thought Adrian was gay too. They called him a

24 "faggot," and Adrian really didn't understand why, not at the

25 time. And so Adrian found refuge in a place that his parents

1    actually agreed on:  in front of a computer, playing with

2    video games online, in the cloud, with the ability to

3    communicate with strangers, without guidance, boundaries, or

4    parental controls.  And for Adrian's parents, Adrian's gaming

5    killed two birds with one stone:  It seemed to solve Adrian's

6    hyperactiveness and his social isolation.  Online gaming

7    silenced Adrian, and it kept Adrian's mother from having to

8    worry about Adrian suddenly running out into the street for no

9    apparent reason and getting struck by a car, and Adrian

10   finally had someone to talk to, to connect with, but Adrian

11   was only silenced in the real world, your Honor.  Inside of

12   Adrian's new online gaming world, his hyperactivity, his

13   impulsivity were actually amplified.

14          As Adrian entered middle school, just as he became

15   even more unpopular in the real world, Adrian discovered

16   entire communities online in the virtual world, where Adrian

17   could be himself, where he could be as obsessive as he wanted,

18   where he could communicate without restrictions, and where

19   Adrian could be seen for who he was.

20          But Adrian could also be seen for who he wasn't.

21   Here, with the stroke of the keyboard, Adrian could talk to

22   anyone and everyone, and no one had to hear Adrian's real

23   voice, no one had to hear Adrian stutter, and where Adrian

24   finally felt he was making friends, real friends, never mind

25   that he would never meet any of his so-called friends in the

1    real world.

2         As Adrian grew older, his online gaming became

3    intoxicating.  He played compulsively, not for an hour or two

4    after school.  No, for Adrian, online gaming occupied every

5    moment of his free time:  mornings, afternoons, evenings,

6    nights, all weekend long.  Adrian played without so much as

7    breaking for food.  Sometimes he had to be reminded to use the

8    bathroom.

9         Later, in early high school when Adrian was

10   introduced to online pornography by his new stepfather, it

11   served as additional sexual instruction beyond his father's on

12   what to do, what to expect, what to say when it comes to sex,

13   and for Adrian, online pornography, as with online gaming,

14   with the simple click of a mouse, Adrian could swiftly move in

15   and out of sexual worlds with fluency.  Like online gaming, it

16   was a place where Adrian felt control.  And sure enough, once

17   Adrian starting viewing online pornography, he had a really

18   hard time stopping.

19        The other problem was, as had always been the case,

20   but what became more prominent as he grew older is Adrian was

21   developing physically at a faster rate than he was developing

22   emotionally, and so when that first time came when Adrian was

23   a teenager and he had a sexual experience for the first time,

24   he didn't feel well.  He felt sick.  Immediately afterwards,

25   Adrian threw up, and miraculously, in spite of all the

1   bullying at school and subaverage grades, Adrian graduated
2   from high school by the skin of his teeth.

3          He moved into his own place, without any supervision,
4   where he could play video games 18 hours a day, to the point
5   where he was actually damaging himself physically, where he
6   was damaging his eardrums from blasting the volume into his
7   headphones so loudly.  And even then when Adrian was 18,
8   living on his own, delivering pizzas, gaming, attending
9   community college, everyone I talked to said Adrian simply hit
10  a ceiling developmentally.  Talking to him when he was 17 or
11  18 was kind of baffling because it was like talking to a
12  14-year-old or a 15-year-old kid.

13         Throughout Adrian's life, his early childhood and
14  adolescence, there were significant signs that Adrian was
15  suffering from autism:  the delayed development, the lack of
16  milestones, the inability to read the emotions of others, the
17  social isolation, the inability to process context, lack of
18  eye contact, sensitivity to light, appearing effeminate.
19  These are all very common.  The rigid and restrictive
20  behavior:  the addiction to gaming, the compulsive behavior,
21  the odd sexual behavior.  But nobody did anything meaningful
22  to have Adrian appropriately evaluated, to find out what was
23  really going on with him, and it would take until Adrian
24  engaged in illegal sexual conduct with girls under the age of
25  18 for Adrian to finally be evaluated and examined by a

1    qualified medical professional and for us to learn that Adrian

2    has autism.

3           And I am not, your Honor, in any way, shape, or form

4    suggesting that Adrian's previously undiagnosed impairment

5    somehow excuses his behavior.  It doesn't.  But it does help

6    explain important aspects of Adrian's life and history.

7           And to prepare for my report, your Honor, I didn't

8    just speak to Dr. Loftin, the expert psychologist who

9    evaluated Adrian.  After I learned that Adrian was autistic, I

10   read books on the subject, I reviewed thousands of

11   peer-reviewed scientific articles, I spoke to experts around

12   the country, and I also heard from parents and foster parents

13   of children with autism.  And what I learned is that sexual

14   abuse for any child is profoundly damaging, but for a child

15   who is autistic, the damage from sexual abuse is even worse

16   because autistic children take everything literally, and

17   that's part and parcel of their social impairment, and

18   autistic children go on to repeat behavior exactly as it was

19   modeled to them, including grossly inappropriate behavior and

20   even illegal conduct, because part of the autism disability is

21   the inability to see and process context and the inability to

22   appreciate what someone else is thinking and feeling.

23          I heard from a mother with an autistic son.  Her son

24   was relatively high-functioning.  He was vocal, he went to

25   school, albeit it a special school, and he managed to survive

1    adolescence until he turned 18, and when he turned 18, your

2    Honor, he ran into a problem.  His problem was that he wanted

3    to have sex with his mother.  Why?  Because he was told his

4    whole life that you only have sex with people you love,

5    literally.  I heard stories like this from parents and foster

6    parents of children with autism that get increasingly worse

7    from there, where adolescents, teenagers, 18, 19 years old

8    where they repeated acts they saw online that I can't even

9    mention.

10          After sexual abuse, the next most damaging thing that

11    can be done to a socially isolated and lonely autistic child

12    is to put that child in front of a computer and let them run

13    wild.  Why?  Because for autistic kids, computers exacerbate

14    the learning of inappropriate social behavior, and because

15    autistic kids don't have the neurons, they don't have the

16    capacity to critically evaluate the consent they are

17    consuming, and, very critically, differentiate fantasy from

18    reality, the real world from the virtual world.

19          And while the most effective forms of intervention

20    for autistic children begin at the age of 2, the good news

21    here is that it is not too late for Adrian, and while Adrian's

22    behavior was learned, studies show that for high-functioning

23    autistic children or young adults like Adrian, his behavior

24    can be unlearned, and it requires doing what should have been

25    done a long time ago for Adrian:  setting strict boundaries.

1  Because to deprive boundaries to someone who is autistic is to

2  leave them clueless as to what sorts of behavior is acceptable

3  and completely unacceptable.  And that begins with teaching

4  Adrian that what was done to him, that what he endured was

5  wrong, that it was unacceptable.

6       Adrian also now needs to learn to navigate this

7  complexity in ways that are appropriate, and it must be

8  modeled for him.  Adrian has to learn how to handle and

9  respond to rejection appropriately, and Adrian needs to learn

10  to see sex as something that sits best within a relationship

11  that is loving, private, and trustworthy.

12       Given the context of Adrian's impairment, none of the

13  interventions Adrian needs to deter him from engaging in

14  future illegal conduct and protect the community is going to

15  happen in prison.  On the contrary, what's going to happen to

16  Adrian is the longer he spends in prison, it is more of what's

17  already happened to Adrian while he has been incarcerated:  He

18  is going to be victimized.

19       And the comorbidity that Dr. Loftin talked about as

20  it relates to Adrian, his anxiety, his depression, it is very

21  likely going to go untreated, and it is going to get worse.

22  And the problem with the government's sentencing argument is

23  that it seems to ignore this context that has so profoundly

24  informed Adrian's life and history, that all the things Adrian

25  endured throughout the vast majority of his life when he was a

1    kid, they were things that were done to him for which he had

2    no choice, with the disability and impairment he was born with

3    that no one identified, and the abuse he endured in

4    environments from which he could not extract himself.

5            The place Adrian is going to change is going to be in

6    a place that is the least restrictive environment, under

7    supervision, and we ask that your Honor impose a sentence that

8    gets Adrian the support his disability demands as soon as

9    possible.

10           Thank you, your Honor.

11           THE COURT:  Did you want to ask him any questions?

12           MR. LOVE:  I would, your Honor.

13           THE COURT:  Okay.

14           MR. LOVE:  I would like to ask the witness whether

15   Mr. Peters, and not anybody else that was interviewed, but

16   Mr. Peters specifically, stated anything to him about why he

17   engaged in physical abuse of some of the partners that are

18   charged in the indictment.

19           MR. BARBERY:  I'm sorry, could you repeat that,

20   please?

21           MR. LOVE:  Sure.

22           THE COURT:  Did Mr. Peters ever say anything to you

23   about why he engaged in physical abuse with any of the victims

24   that were charged in the case?

25           MR. LOVE:  Correct.

1          THE COURT:  That was your question, right?

2          MR. LOVE:  Yes, sir.

3          THE COURT:  Yes, that was his question.

4          MR. BARBERY:  No, he did not.

5          MR. LOVE:  Same question, your Honor, not with regard

6    to physical abuse, but with regard to verbal abuse.

7          MR. BARBERY:  You are asking why?

8          THE COURT:  I think what he is asking is if

9    Mr. Peters ever told you why he abused any of the victims that

10   are identified in the case, either physically, emotionally,

11   mentally, verbally, and so on.

12         MR. BARBERY:  He only discussed it so far as to

13   recognize that it was wrong and that he is sorry and that he

14   is remorseful.

15         THE COURT:  Okay.  So that's kind of a no.

16         MR. LOVE:  Well, that's a general answer, your Honor.

17   I would like to ask for a bit more specific answer.

18         I want to know whether or not in the general

19   acknowledgment of his sorrow that he stated to the witness he

20   specifically acknowledged he had engaged in physical abuse.

21         MS. SKWOR:  Your Honor, if I may, I believe my client

22   will be making a statement to the court and during his

23   statement will be acknowledging his wrongful actions and the

24   infliction of pain that it caused.

25         THE COURT:  Okay.  But still, I don't think it is an

1  unfair question for Mr. Love to ask because, I mean, honestly,

2  you spent more time with Mr. Peters than pretty much anybody

3  else in the room, maybe with the exception of Ms. Skwor.  I

4  don't know.  So it's a fair question, I think.

5         MR. BARBERY:  I'm sorry.  So much has happened since

6  you asked me that --

7         THE COURT:  Yes, and since I don't have the realtime

8  up and running, try again.

9         MR. LOVE:  I will reask it.

10         THE COURT:  Yes.  Thanks.

11         MR. LOVE:  Thank you, your Honor.

12         My question is during the statements to you in which

13  you indicate he indicated his sorrow and regret, he

14  specifically indicated sorrow and regret for physical

15  victimization of the victims.

16         MR. BARBERY:  He expressed regret and remorse for the

17  crimes for which he has pled guilty.

18         MR. LOVE:  And I don't want it to turn into something

19  like a courtroom drama, your Honor, but I have to ask the

20  witness:  Is the answer no?

21         THE COURT:  Well, you know, one of the reasons you

22  don't have to turn it into a courtroom drama is because there

23  is no jury in the box.  So I can kind of tell.

24         MR. LOVE:  All right.  I will move on.

25         THE COURT:  I think you can move on.

1    MR. LOVE: Did the witness -- or did Mr. Peters

2 indicate to you why, in fact, he had taken video recordings of

3 sexual activities of any of the victims or his sexual

4 activities with any of the victims?

5    MR. BARBERY: No.

6    MR. LOVE: Was there any indication in all of his

7 personal history that you saw that there was an indication

8 that he had observed anybody else taking videos of sex, like

9 his father?

10    MR. BARBERY: Well, I discussed at length his

11 experience and difficulty with impulsivity around -- on

12 viewing online pornography, which involves recording of people

13 who are engaged in sexual activity.

14    MR. LOVE: I will ask the question differently and

15 more specifically.

16    Specifically, did he indicate why he personally

17 videotaped sexual acts with the victims?

18    MR. BARBERY: No.

19    MR. LOVE: You indicated that one of the major

20 reasons that sexual misconduct for people who have ASD is

21 because they take things literally; is that right?

22    MR. BARBERY: Yes.

23    MR. LOVE: Okay. And, in fact, you said they take it

24 literally and explicitly?

25    MR. BARBERY: Yes.

1      MR. LOVE:  All right.  So are you telling the court

2   that Mr. Peters' sexual conduct and the charges -- the conduct

3   and the charges in this case were the result of, directly, as

4   far as you can tell, the result of his exposure by his father?

5      MR. BARBERY:  Well, that's what Dr. Loftin said, the

6   expert that we hired to evaluate Adrian.

7      MR. LOVE:  All right.

8      MR. BARBERY:  And she talked at length about -- in

9   her report, about the relationship -- the direct relationship

10   between, essentially, the abuse that he endured and the direct

11   repetitiveness of that playing out, of the adult on younger

12   person, how that was modeled to him, and in the context of the

13   broad spectrum of autism, and also his specific diagnosis and

14   his impairment.

15      MR. LOVE:  It was described at length by you in your

16   report the violence towards the defendant that was done by his

17   stepfather, right?

18      MR. BARBERY:  That's correct.

19      MR. LOVE:  All right.  But violence does not seem to

20   be a problem in the defendant's life, does it?

21      THE COURT:  I'm not sure I understand what exactly

22   you are asking.

23      MR. LOVE:  Has Mr. Peters' history of violence

24   matched his history of inappropriate sexual conduct?

25      MR. BARBERY:  My opinion is that, no, that there is

1    parts of his brain where he has been able to cope with his

2    history on his own, without appropriate interventions, and

3    there are parts of him that are unwounded, and that's also

4    part of what I'm talking about.  Autism affects the entire

5    brain, but in specific parts of it, and so it is not going to

6    relate to everything that has ever been done to him.

7            MR. LOVE:  That's all I have.

8            THE COURT:  Thanks.

9            Can I ask you just a couple of questions?

10           So you were -- I mean, in sort of the preface to your

11   report -- I don't think I heard:  Do you do both Rockford and

12   Chicago cases?

13           MR. BARBERY:  I'm sorry?

14           THE COURT:  Do you do both Rockford and Chicago, or

15   are you just here?

16           MR. BARBERY:  Yes, your Honor, both Chicago and

17   Rockford.

18           THE COURT:  I don't -- have I ever seen you?  Have

19   you ever been in my courtroom?

20           MR. BARBERY:  Your Honor, I have never had the

21   pleasure.

22           THE COURT:  Okay.  Well, you didn't have to say that.

23   But I have never seen you before.  Okay.

24           So just -- I know from your background that you were

25   a mitigation specialist in -- is it Orleans Public Defenders?

1    Is that New Orleans?

2            MR. BARBERY:  Yes, your Honor.

3            THE COURT:  Okay.  Got it.

4            And your training is largely as a result of your

5    postgraduate work and then your -- and then specific training

6    relating to mitigation-type work, right?

7            MR. BARBERY:  That's correct, your Honor.

8            THE COURT:  Okay.  All right.  Thanks.

9            You can have a seat.

10           MR. BARBERY:  Thank you, your Honor.

11           THE COURT:  I noticed about eight or ten minutes ago,

12   somebody came in.  Is that Mr. Peters' mother?

13           MS. SKWOR:  Yes.

14           THE COURT:  Okay.  Great.

15           So I'm going to make the finding on the acceptance of

16   responsibility when I make my comments at the end.

17           So I think where we are at this point now is -- you

18   know, everybody does these things a little bit differently.

19   So we are at the 3553(a) part of this.  I mean, you know,

20   there is the possibility of a three-point swing, which really

21   doesn't matter in the final analysis because it all goes down

22   to 43.

23           So I would like to hear first from the government

24   regarding the appropriate sentence, then from defense counsel,

25   I will give Mr. Love a chance to respond to anything he thinks

1   he needs to, and then Mr. Peters gets to talk last, unless

2   there is anybody else who is going to talk, and I know that

3   the only people in the courtroom are the court staff, counsel,

4   and Mr. Peters' mother.

5          So did you want to confirm whether she wants -- do

6   you want to go check with her and find out whether she wants

7   to say anything?

8          MS. SKWOR:  May I have just a moment?

9          THE COURT:  Yes, go ahead.

10    (Brief pause.)

11         MS. SKWOR:  Thank you, your Honor.

12         No, Mr. Peters' mother does not need to address the

13  court.

14         THE COURT:  Okay.  All right.  Mr. Love, you are up.

15         MR. LOVE:  Your Honor, the government's observation

16  is that there is nothing in the history that has been provided

17  to the court, the history of this defendant, about any history

18  of observation, of perpetrating sexual acts, physical

19  violence, coercion, verbal abuse, or videotaping sexual

20  conduct in his history.  Regrettably, the government concludes

21  that the most that ASD could be said to have done to him is,

22  perhaps, make him more impulsive, not to cause him to

23  specifically target minors on the internet and in person.  It

24  begs the question why this impulsivity didn't cause more

25  criminal conduct or more bad acts.

 1            As I pointed out in my question to the witness, he

 2    was a victim of violence, but he didn't turn around and

 3    victimize other people with violence, except as what we know

 4    in this case, but that was not the same type of violence.   It

 5    was done in regard to sexual conduct as opposed to the normal

 6    run-of-the-mill conduct that he would run into in the world.

 7            There is nothing in the report by Ms. Loftin that

 8    indicates that the defendant was in any way unable to

 9    determine the difference between right and wrong.   He

10    pursued -- as I mentioned in the government's sentencing

11    memorandum, he pursued the criminal justice degree.   That

12    indicates an interest in knowing about the law.   I don't know

13    if it indicates an interest about following the law or about

14    acting appropriately, but I should think that it's an

15    indication that he wants to do things right.

16            In the final analysis, Judge, the government denies

17    the premises that the defendant didn't act with full knowledge

18    of exactly what he was doing, full knowledge that it was

19    wrong, whether or not he could cite the statute in Title 18,

20    that he knew right from wrong, and that he was in a position

21    throughout his life to observe other sexual norms.

22            One of the things that Loftin said was that he wasn't

23    in a position to -- or she didn't say he wasn't in a position.

24    She said he hadn't, apparently, seen normal sexual relations,

25    but that denies him having lived in the world that we live in,

1    all the way up to the age when he was an adult and perpetrated

2    these acts.

3           So it just seems implausible, if not impossible, that

4    any adult with a high school diploma, taking higher education

5    classes, doesn't know the absolute wrongful nature of his

6    conduct, and that some aspects of his growing up were

7    regrettable, that he wasn't diagnosed with ASD is regrettable,

8    but those are not excuses.  And as much as it gets said in

9    sentencings all the time that these explanations are not

10   excuses, at least in this particular case, the very nature of

11   the mitigation report and the focus on all the tiny little

12   things that were bad in this defendant's life, without the

13   counterbalance of looking at what the defendant did and

14   explaining those specifics don't speak well for those reports.

15          So the government will stand by its recommendation in

16   the government's sentencing memorandum, your Honor.

17          THE COURT:  Thanks, Mr. Love.

18          Ms. Skwor?

19          MS. SKWOR:  Thank you, your Honor.

20          Your Honor, as this court is well aware, the

21   calculation of the guidelines is the starting point.  It is

22   the benchmark, but it is not the final determination of what

23   an appropriate sentence is.  The guidelines are but one factor

24   that the court must consider.

25          3553(a) lists first and foremost the court must

1  consider the nature and circumstances of the offense and the

2  history and characteristics of the defendant.

3        With respect to the nature and circumstances of the

4  offense, Adrian Peters does not dispute the government's

5  version of events.  He agrees with what was set forth in the

6  plea agreement and in the presentence report.

7        At the time, Adrian himself was between the ages of

8  20 and 22 when he met and had contact with the victims in this

9  case.  At the time of the crimes, the victims, who are now

10  women, were under the age of 18, but pubescent or

11  post-pubescent, and on an intellectual level, my client

12  thought he was connecting with these girls, despite that age

13  difference.

14        Adrian thought of these women as his girlfriends.  He

15  considered himself romantically involved with them.  In every

16  case, the government is never compelled to prove or answer one

17  question.  That is why this question and its answer are

18  important in any case, but especially in this one.  Why did

19  Adrian do what he did, and what is to stop him from doing it

20  in the future?

21        To answer this question, the defense consulted with

22  Dr. Loftin, a licensed clinical psychologist and autism

23  consultant.  Dr. Loftin agreed Adrian's attention deficit and

24  hyperactivity disorder, or ADHD, is an appropriate diagnosis.

25  Dr. Loftin went further and diagnosed Adrian with autism

1    spectrum disorder or ASD.

2           Dr. Loftin explained that ASD is a brain-based
3    dysfunction of social thinking and behavior.  People with ASD,
4    people like Adrian, have difficulty learning social norms
5    without direct and explicit instruction.  They have
6    difficulty, but it's not impossible.

7           Relationships, especially sexual relationships, are
8    highly complex and difficult for people like Adrian to
9    navigate.  Adrian needs specific instruction as to what is
10   appropriate and inappropriate.  With the appropriate
11   instruction, counseling, and therapy, Adrian can learn to
12   navigate relationships, including sexual relationships, in a
13   socially acceptable manner.

14          Adrian has the love and support of his family,
15   especially his mother, who has been supportive of him
16   throughout this case.  As the court noted, she is present here
17   this afternoon.  Adrian's mother simply asks that this court
18   take mercy on him.

19          During his pretrial supervision, Adrian developed a
20   useful treatment relationship with his former counselor,
21   Mr. Steve Eisenburg, a licensed clinical professional
22   counselor.  In fact, Adrian has maintained contact with
23   Mr. Eisenburg while he has been incarcerated.  If able, Adrian
24   would like to continue his counseling with Dr. Eisenburg
25   throughout his incarceration and upon his release.  In

 1   Mr. Eisenburg's opinion, Adrian is ready, willing, and able to

 2   work on his issues and to reenter society as someone who is no

 3   longer a threat to society.

 4        Adrian has substantial rehabilitative potential.  A

 5   lengthy term of imprisonment is not necessary or appropriate

 6   for Adrian.  In fact, in preparing for this day, Adrian has

 7   learned so much about himself.  It is no stretch to say that

 8   the man in this courtroom today is not the same 22- or

 9   20-year-old seeking to connect with teenage girls that he was

10   five years ago.  Now, armed with the knowledge of his ASD and

11   from his discussions with his counselor about appropriate

12   social norms, Adrian is prepared.  He is not likely to

13   re-offend.  He is ready to move forward.  For the hurt that he

14   has caused to the victims and to their families, Adrian

15   sincerely apologizes.

16        Adrian does have hopes and plans upon his release of

17   writing video games.  He has formed -- he has fostered a

18   relationship with a friend who hopes to introduce him to the

19   video gaming world.

20        To this court, Adrian implores the finding of a life

21   sentence is unwarranted.  The defense respectfully recommends

22   a term of imprisonment to the 15-year mandatory minimum, with

23   the acknowledgment that this court cannot sentence him to any

24   less.

25        The defense requests a recommendation to the

1    Louisville, Kentucky, facility if space is available.

2             THE COURT:  Louisville is a what?  Is it an FMC?

3             MS. SKWOR:  It is an FMC.

4             THE COURT:  Okay.

5             MS. SKWOR:  And the defense respectfully requests

6    this court impose the minimum term of supervised release of

7    five years upon his release.

8             THE COURT:  So I want to ask you a question or two

9    about supervised release conditions, and I'm looking at

10   page -- I thought I had it here a second ago.

11            It's page 6 of the memo.

12            Putting aside the length issue, which you just talked

13   about, in terms of the recommended conditions that were in the

14   presentence report, the one that you have an objection to is

15   No. 14, having to do with travel?

16            Is that right?

17            MS. SKWOR:  That's correct, your Honor.

18            THE COURT:  And you went over all the conditions with

19   Mr. Peters?

20            MS. SKWOR:  We did, yes.

21            THE COURT:  Okay.  So one of the things I'm going to

22   ask him, and Mr. -- well, at some point, you may want to just

23   go over it with him.  As you guys no doubt know, I have to

24   read the supervised release conditions out loud unless the

25   defendant tells me that I don't have to.  So I'm going to ask

1   him that question at some point.

2           All right.  Have you finished what you wanted to say?

3           MS. SKWOR:  I have, your Honor.

4           THE COURT:  All right.  Mr. Love?

5           MR. LOVE:  Very briefly, your Honor.

6           The government did, in fact, state the reason for the

7   defendant's conduct, the government's conclusion regarding why

8   the defendant did what he did, in its sentencing memo.

9   Specifically, the government stated that he had engaged in

10  that conduct because he has a deviant sexual interest in

11  minors, and as far as proving that, the defendant proved that

12  through his plea in this case, his own conduct.

13          THE COURT:  All right.

14          MR. LOVE:  Nothing further.  Thank you, your Honor.

15          THE COURT:  All right.  Did you have any issues with

16  the supervised release conditions at all?  Anything?

17          MR. LOVE:  No, your Honor.

18          THE COURT:  Okay.  All right.

19          Okay.  Mr. Peters, you have the right to tell me

20  anything that you would like me to consider before I impose a

21  sentence on you, and this is your chance to do that, if you

22  would like to.

23          DEFENDANT PETERS:  Your Honor, I have been dealing

24  with this case for over five years.  I have had a significant

25  amount of time to reflect on who I was as a person and what I

1    have done compared to who I want to be and what I want to do.

2    Who of us here can say that we are the same person from five

3    years ago?

4            After years of self-reflection, I am filled with deep

5    regret and shame for my actions.  It is impossible for me or

6    anyone to fully comprehend how these women must feel.

7    Regardless of the sentence imposed, I sincerely wish that

8    these women can find it in their hearts to forgive me and for

9    my part in this and how I hurt them.  Although I cannot go

10   back in time and change what happened, I realize my faults and

11   have and will actively continue to better myself for the

12   future in the hopes that one day I can be a person that my

13   family can be proud of.

14           THE COURT:  Thanks.

15           I'm going to ask you a question:  You were reading

16   off of something.  Did you write it yourself?

17           DEFENDANT PETERS:  Yes, your Honor.

18           THE COURT:  Okay.  There were a couple of things I

19   neglected to ask counsel.

20           In the scheme of things -- they are not huge

21   things -- but Mr. -- does anybody know whether the time that

22   Mr. Peters was in custody in Canada is something that the

23   Bureau of Prisons will credit him for?

24           MR. LOVE:  I did not think to look into that, your

25   Honor.

1          THE COURT:  Any clue at all?

2          MS. SKWOR:  Your Honor, I don't know the answer.

3          THE COURT:  It is like nine and a half months, it

4    looks like.

5          Yeah, well, I don't know either, so that's why I

6    asked.

7          Okay.  I'm going to start with the supervised

8    release.  So I'm going to impose the conditions of supervised

9    release that were proposed by probation.  The one that has

10   been objected to was the restriction on travel to the district

11   of supervision.  I understand the objection, but I'm going to

12   impose that one anyway.  I do think that there is a

13   significant need for Mr. Peters to be under supervision given

14   the nature and the circumstances of the offenses that he

15   committed and having his travel restricted to whatever

16   district he is in is an important way of facilitating that.

17         Now, you can imagine after some significant period of

18   time, you know, probation can come back or defense counsel can

19   come back and ask to relax those, but for now, I think that is

20   an appropriate restriction.

21         The other question has to do with the length of the

22   term of supervised release.  So I'm going to tell you -- I'm

23   going to tell you what and I'm going to tell you why.

24         So I understand the proposal on the defense side for

25   five years, but I'm going to make it, as recommended by

1    probation, lifetime, and here is why I say that:  So -- and

2    I'm going to come back to this in a little bit, but it's not

3    possible for me to know why Mr. Peters did what he did.  It is

4    just not possible, frankly, for anybody, but certainly not

5    possible for me.

6          But one way or another, I mean -- and I suppose that

7    both the government and the defense could be wrong, but the

8    government says, "Well, he has a deviant sexual interest in

9    minors," and the defense says, "It is because of the fact that

10   he was overly sexualized by people around him when he was

11   growing up and he is on the autism spectrum."

12         Either way, he is not likely to get any significant

13   treatment for that while he is in prison, and one way or

14   another, it is going to be a long prison term in this case.

15   So there is no guaranties in life, and so it just seems to me

16   that the almost default, given the nature of the conduct, has

17   to be a lifetime supervised release because there is enough to

18   be concerned about here that, you know, conduct could be

19   attempted again in the future.

20         So, Mr. Peters, the law says I have got to read the

21   supervised release conditions to you out loud unless you tell

22   me that I don't have to, and your lawyer said she went over

23   them with you.

24         Do I need to read them out loud?

25         DEFENDANT PETERS:  May I have a minute to go over it,

1  please?

2      THE COURT:  That's just fine, yes.  They are all

3  going to be in the judgment that you will presumably get a

4  copy of, but take your time.  That's fine.

5    (Brief pause.)

6      THE COURT:  If you want me to read them, it's not a

7  problem.  I have got no problem doing it at all.  It just

8  takes a little time is all.

9    (Brief pause.)

10      THE COURT:  Okay.  Another 30 seconds, I'm just going

11  to read the darn things.

12    (Brief pause.)

13      THE COURT:  Okay.  Fine.  Enough.  I'm going to read

14  them.

15      Here we go.  All right.  So here are the conditions

16  of supervised release, Mr. Peters:

17      You can't commit any kind of a crime:  federal,

18  state, or local.

19      You can't unlawfully possess a controlled substance.

20      You will be required to register and comply with all

21  the requirements of something called the Sex Offender

22  Registration and Notification Act, which is a federal law.

23      If the law requires it, you will have to cooperate in

24  the collection of a DNA sample.

25      You can't use any -- you can't engage in any unlawful

1    use of a controlled substance, and you will have to submit to

2    drug testing up to 104 periodic tests during each year of

3    supervised release.

4           One second here.  I need to check one thing before I

5    say the next.

6           So actually, the next thing reminds me of something I

7    had neglected to ask and that has to do with restitution.

8           MR. LOVE:  There is no claim for restitution.

9           THE COURT:  There is no claim for restitution.  So,

10   actually, we can probably skip the next condition that is

11   listed there, which was -- I have got to get back to

12   it -- yes, make restitution of victim of the offense.  So we

13   should eliminate discretionary condition 2.  I'm not going to

14   read that.

15          Once you are on supervised release, you will have to

16   seek and work conscientiously at lawful employment.  If you

17   are not employed, you will have to conscientiously pursue

18   study or training that will equip you to do that.

19          You can't knowingly meet or communicate with any of

20   the victims of the crime, the crime that you plead guilty to,

21   or the other stipulated conduct that you agreed to.

22          You can't use alcohol.

23          You can't possess a firearm or destructive device or

24   dangerous weapon.

25          You will have to participate in substance abuse

1    treatment programs which can include substance abuse testing.

2           You have to participate in a mental health treatment

3    program and take whatever medications are prescribed.

4           You can't leave the district that you are being

5    supervised in.  The Northern District of Illinois, if this is

6    where you end up, it is basically the northern third of the

7    state.  If you can imagine a map of Illinois and chop off the

8    northern third, it is basically that.

9           You will have to report to a probation officer as

10   directed to.  The probation officer will be able to visit you

11   at any reasonable time at home, at work, or any other

12   reasonable location that the probation officer specifies.  If

13   there is any contraband in plain view, you will have to permit

14   confiscation of that.

15          You have to notify the probation within 72 hours

16   after you become aware that you are going to change your

17   residence or your workplace.

18          You will have to answer truthfully any questions that

19   are posed by the probation officer unless you have a

20   constitutional privilege not to.

21          If you have any contact with law enforcement, even if

22   it's something as simple as a traffic stop or certainly

23   something more serious like an arrest or charge, you have to

24   notify the probation officer within 72 hours.

25          Over to the next page, you will have to submit your

1    person, property, residence, vehicle, and papers, including

2    computers to searches by probation.  If you don't, that is

3    grounds to revoke your supervised release.  You will have to

4    warn anybody else who is occupying the place where you are

5    that the premises may be subject to search.  This requires

6    reasonable suspicion that you violated the conditions of your

7    release or that there is evidence of that, and it would have

8    to be at a reasonable time and manner.

9         You can't -- yes, we can skip special condition 5

10   because that deals with -- 5, 6, and -- 5, 6, 7, and 8 all

11   deal with restitution.  I'm eliminating those.  Actually, it

12   is probably valuable that I'm reading these.

13        And then there is a number of them that relate to

14   participation in a sex offender treatment program.  The

15   probation officer will determine the specifics of that.  You

16   will have to comply with any recommended treatment which can

17   include testing, either psychological or physiological, and as

18   I said before, it could include prescribed medication.

19        The probation office has a computer and internet use

20   monitoring program.  You will have to consent.  You will have

21   to comply with that, and that will involve installing

22   monitoring software on any computers which you will have

23   access to which can restrict your activity and/or record it.

24   You can't tamper with any notices that are placed on that.

25        I'm going to waive the cost of the monitoring.  So

1    I'm going to X that one out.

2           You can't possess any computer, external storage

3    device, or any device that allows access to the internet or

4    any online computer service without getting approval in

5    advance from probation.

6           You can't possess any device that can be used for

7    covert photography, which pretty much means a cell phone, and

8    any other photographic device without prior approval by

9    probation.

10          You can't view or possess child pornography, and if

11   your treatment provider decides that exposure to other

12   stimulating -- sexually stimulating material might be

13   detrimental, they can ask me to modify that condition to make

14   it broader.

15          You can't engage in activities that would put you in

16   supervised private conduct with anybody under the age of 18

17   unless you get approval from probation and your treatment

18   provider.

19          You can't knowingly visit locations where people

20   under the age of 18 regularly congregate, like parks, schools,

21   playgrounds, et cetera.  This doesn't apply to contact in the

22   course of normal commercial business or unintentional or

23   incidental contact.

24          Your employment is restricted to the district where

25   you are being supervised.  You have to get approval from

1  probation before you accept any employment so they can assess

2  risk, and you can't participate in voluntary activity that

3  puts you in direct contact with children unless probation

4  approves it.

5          You will have to provide probation with copies of

6  your phone bills, credit cards statements, and other financial

7  information.  That is basically so they can check what you

8  have been doing.

9          And you have to comply with any state or local laws

10  relating to convicted sex offenders.

11          We don't need No. 10 because that relates to

12  restitution.

13          And then the last one is you can't enter into any

14  agreement to act as an informant or an agent of a law

15  enforcement agency without getting court permission.

16          Okay.  Those are the conditions of supervised

17  release.  Now we got all of that out of the way.

18          So I'm going to take this off.

19          The crimes here are extraordinarily serious,

20  Mr. Peters, and when Ms. Skwor -- and I know what she meant by

21  this -- said that a lengthy term of imprisonment isn't

22  appropriate, even if I imposed the mandatory minimum, that's a

23  lengthy term of imprisonment, 15 years.  It's warranted in

24  this case, and it's warranted because what you did was really

25  quite aggravated and extremely serious.

1      I will say that, you know, this isn't a case of a

2  50-year-old having sexual contact with an 8-year-old or an

3  11-year-old.  For the most part, most of these incidents

4  involved somebody who was around 20 having sexual contact with

5  somebody who was around 16 or 17.  There were some where the

6  age was below that, and those are obviously more serious.

7      But one way or another, it's sexual behavior that in

8  some of these instances appears to have been coerced.  People

9  were photographed, I think it's reasonable to believe, against

10  their will, and there is no indication that that was traded

11  with anybody, but the fact that it was out there just had to

12  have been horrendous for these people, above and beyond having

13  to reflect on and think about what you had done with him.  So

14  it is an extraordinarily serious crime, and that's why you are

15  facing a really serious sentence.

16      So Ms. Skwor makes the point that we have got to

17  figure out why this happened.  So I'm just going to tell you,

18  and I said a second ago, I'm never going to be able to figure

19  that out.  None of us can.  In some instances of crimes, it's

20  easy to figure out.  Here it is not.

21      The government's take on it, and I wrote it down,

22  it's a quote, "because Mr. Peters has a deviant sexual

23  interest in minors."  Honestly, to me, that just begs the

24  question why.  So why does he have a deviant sexual interest

25  in minors?  The explanation that's given by the defense expert

1    is it has something to do with autism.  I don't know if that

2    is right or not.

3         But what I will say and what I think I can say is

4    that some of the things that happened that were done to

5    Mr. Peters when he was growing up, I would have to have

6    blinders on to think it didn't have some effect on him and

7    some impact on what happened here.  It doesn't excuse it.  It

8    doesn't probably fully explain it, but it can't be ignored.

9         I guess one thing I have to take issue with, and I'm

10   not sure this is -- you know, when the reference was made to

11   defense reports focusing on tiny little things that went

12   wrong, some of these things were not by anybody's stretch of

13   the imagination tiny, and there is no dispute that they

14   happened, that Mr. Peters was extremely sexualized by people

15   around him in a way that was coercive to him.  For whatever

16   reason, whether it is because of that or because he is on the

17   autism spectrum, he ended up spending huge amounts of time

18   online where he saw, it is pretty well shown, and got

19   effectively addicted to pornography.

20        I agree with Mr. Love that none of what Mr. Peters

21   says was done to him was what he did to other people.  Having

22   said that, it would not be the least bit surprising that a

23   good part of what Mr. Love -- or what Mr. Peters saw online

24   were kinds of some of the same things that he was doing when

25   he had these illegal and inappropriate encounters with these

1    under-age girls.  And so I think all of that had an effect.

2    It just can't be ignored.

3           And so what does that all mean?  I mean, in

4    this -- you know, one of the big questions here is:  What's

5    going to happen in the future?  And of course none of us can

6    really know that, but unless I impose effectively a life

7    sentence, which I do not think is appropriate for reasons I

8    will describe in a second, Mr. Peters is going to get out at

9    some point, and I can't know what's going to happen then.

10          Now, there is a difference between the 19- or

11   20-year-old soliciting a 16- or 17-year-old and somebody who

12   is in their late 40s or 50s doing that or 60s or whatever.

13   It's probably not as easy.  But nonetheless, whatever

14   condition that Mr. Peters has or had that led him to engage in

15   this behavior isn't going to go away.  I said that before.  It

16   is not -- you can't snap your fingers and make it go away.

17   There is no kind of treatment he is going to get in prison

18   that is going to make it go away.  And that's why I imposed

19   the lifetime term of supervised release because there is no

20   way of predicting the future.

21          I mean, I certainly hope that once Mr. Peters gets

22   out, which he will, that he is able to get effective therapy.

23   I know that therapy or at least my understanding is that

24   therapy for people on the autism spectrum is not easy.  It's

25   not like talk therapy for somebody who has depression.  It is

1 a lot more complicated and difficult and long term than that.

2 I am hoping that Mr. Peters will get that when he gets out,

3 and that's part of the reason why the conditions on mental

4 health treatment are in there.

5 But he is also going -- and, I mean, this can all be

6 combined, obviously.  Obviously, he is going to have to have

7 some sort of therapy and treatment for what he was doing to

8 people, and I do think Mr. Peters has accepted responsibility

9 at some level.  I think that is shown in part by his statement

10 here.  I think it is shown in part by the fact that he pled

11 guilty and admitted the other conduct.  So I am going to give

12 him credit for acceptance of responsibility, which really

13 results in the offense level still being 43.  All it means is

14 it doesn't get knocked down from 50 to 43.  It gets knocked

15 down from 47 to 43.

16 Both sides I guess wanted me to say something about

17 whether and the extent to which I'm taking into account the

18 flight and escape and the bail jumping or whatever term you

19 want to use for it.  I just got to tell you, I mean, I

20 don't -- both sides basically said, "Well, tell us what

21 sentence you are giving, and then tell us what sentence you

22 would have given if you hadn't taken that into account."  That

23 assumes -- and maybe this all comes from everybody growing up

24 in the age of the guidelines.  That assumes that sentencing is

25 some sort of tabulation of points on a board and writing down

1    factors here and there and taking off a little and adding on a

2    little.  Maybe there are people who do it that way; I don't.

3          What I will say is that I'm taking into account the

4    fact that Mr. Peters tried to escape responsibility for what

5    he did.  I'm also taking into account the fact that since he

6    has come back, he has accepted responsibility, at least to a

7    significant extent.  So I'm taking into account the escape,

8    but I'm not going to say that the sentence would be X if I

9    wasn't taking that into account.  I just don't think that's

10    appropriate, and it is not the way I do sentencing, and I'm

11    not going to get sort of forced into that.  So, so be it.

12          I do not think a sentence at the mandatory minimum is

13    sufficient.  I think the conduct is way too severe for that.

14    I do not think a life sentence is appropriate.  I think my

15    general view of things is that life sentences are reserved for

16    murder cases, and maybe some other extremely serious cases,

17    way more serious than what we are talking about here, and not

18    that this isn't serious.  I don't think a life sentence is

19    appropriate, and I'm not going to do what is sometimes done

20    where I say, you know, the sentence is X, and then it doesn't

21    say "life," but it amounts to a life sentence.  I am going to

22    impose a sentence of 26 years' imprisonment.

23          So the way I'm going to get to that is it is going to

24    be 15 years on the first of the three counts.  So it is going

25    to be a 15-year sentence on each of the three counts, but on

1   count -- is it count 1, 2 and 3?  I think that's what it is,

2   right?

3           Hang on a second.

4           I'm sorry, it is counts 5, 11 and 12.  So the

5   sentence on each of those is 15 years.

6           On count 5, it is 15 years, and on count 11, it is 15

7   years of which 11 are consecutive to count 5 and the other

8   four are concurrent.

9           And on count 12, it is 15 years, all concurrent to

10  the sentence on count 11.

11          I think that covers it.  The goal is 26 years.

12  That's the bottom line.

13          I'm not imposing a fine because there is no ability

14  to pay.

15          The special assessment is $100 per count.  It is a

16  total of $300.  That's mandatory.

17          I have already dealt with the supervised release.

18          Is there a motion to dismiss the other counts?  Is

19  that right?

20          MR. LOVE:  Yes, your Honor.

21          THE COURT:  The remaining counts are dismissed on the

22  government's motion.

23          I am going to recommend that Mr. Peters be designated

24  to FMC Louisville because of his need for treatment, which I

25  think is quite significant, and I'm going to say something

 1    about that in the J&C so BOP is aware of it.

 2            I'm also going to propose, and you will tell me if

 3    you think this is a bad idea, Ms. Skwor, that the report from

 4    your doctor -- is it Larkin -- yes, Dr. Larkin -- be included

 5    with the PSR so that BOP has it because I think, as a general

 6    rule, they don't get sentencing memoranda, and that's all

 7    that's attached to it.

 8            So what's your view on that.

 9            MS. SKWOR:  Yes, Dr. Loftin, and I agree --

10            THE COURT:  I said Larkin.  I meant Loftin.  Sorry.

11            MS. SKWOR:  That's okay.

12            I agree that's appropriate.

13            THE COURT:  So if you need her to send it to you

14    again, just get in touch with her.

15            Okay.  Before I advise Mr. Peters of his appellate

16    rights, is there anything anybody thinks I overlooked?

17            First you, Mr. Love.

18            MR. LOVE:  Nothing, your Honor.

19            THE COURT:  Ms. Skwor?

20            MS. SKWOR:  No.

21            THE COURT:  Probation officer?

22            MS. POWELL:  Judge, just to clarify that the lifetime

23    term of supervised release is concurrent.

24            THE COURT:  Yes, thank you very much.  That's on all

25    three counts.  All three counts concurrent.  Thanks for

1    clarifying that.  I appreciate it.

2            All right.  Anything else?

3            All right.  So, Mr. Peters, you have the right to

4    appeal.  To do that, you would have to file a notice of appeal

5    with the clerk of this court, and you would have to do that

6    within 14 days after the judgment gets entered.  If you

7    couldn't afford a lawyer -- you can't afford any of this

8    stuff, so you won't have to pay for a lawyer if you want to

9    appeal, you won't have to pay for the filing fee for the

10   appeal, and you won't have to pay for the cost of any

11   transcripts of court hearings.

12           Do you understand all that?

13           DEFENDANT PETERS:  Yes, your Honor.

14           THE COURT:  Okay.  So by the time you get out, I'm

15   probably not going to be around anymore.  Somebody is, though,

16   and somebody is going to be watching and supervising you, and

17   I know you still have potentially this other case, these other

18   charges to deal with.

19           What I just need to make sure you understand is that

20   being on supervised release is a serious thing, and if you

21   violate the terms of it, whoever is supervising you, whether

22   I'm still kicking around at that point or somebody else, I

23   will not have any hesitation to send you back to prison if you

24   violate the conditions of supervised release.

25           They are going to be very onerous conditions.  It is

1   going to be difficult to comply with.  That's justified

2   because of what you did.  But you are going to have to comply

3   with them.

4          And aside from that, I hope that the rest of your

5   life, once you get out of prison, is less eventful, let's just

6   say, than so far, and that you stay on the straight and

7   narrow.

8          Okay.  We are in recess.

9    (Which were all the proceedings heard.)

10                    CERTIFICATE

11   I certify that the foregoing is a correct transcript from

12   the record of proceedings in the above-entitled matter.

13   */s/Heather M. Perkins-Reiva*          *January 29, 2021*

14   _____        _____
     Heather M. Perkins-Reiva                  Date
15   Official Court Reporter

16

17

18

19

20

21

22

23

24

25